# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

LISA JONES, et al.,          )
                                          )
           Plaintiffs,      )
                                          )    Case No. 07 C 7139
      v.                         )
                                          )    Judge Joan B. Gottschall
FIRST STUDENT, INC.,      )
                                          )
           Defendant.      )

## MEMORANDUM OPINION & ORDER

Plaintiffs Lisa Jones, Terry Beasley, Sr., Christina Brooks, Michael D Bryant, Dominique Davis, Steven Forthenberry, Robert M Hoskins, and Dora Red have filed a four-count complaint alleging racial discrimination under Title VII and 42 U.S.C. § 1981 against Defendant First Student, Inc. ("FSI").  Count I is a collective count brought on behalf of Jones, Beasley, Bryant, Davis, Forthenberry, and Red, alleging that FSI permitted a hostile work environment.  Count II is an unlawful discharge claim specific to Brooks.  Count III is an unlawful discharge claim specific to Hoskins.  Count IV is an unlawful retaliation claim specific to Jones and Forthenberry.

FSI's motion is granted as to Count III and Count IV to the extent that Count IV relates to attendance warnings.  FSI's motion for summary judgment is denied as to Count I and the remainder of Count IV.  FSI's motion for summary judgment is denied as to Count II, subject to the possibility for a motion for reconsideration as described in the text below.

# I. BACKGROUND[1]

The plaintiffs are current and former employees of FSI. FSI provides busing services to school districts throughout the United States, including at Danville, Illinois, where the plaintiffs worked and where the events underlying this action occurred. FSI is a separate entity from the schools. Red worked for FSI as a bus monitor or bus aid (a person who rides on school buses and assists the driver), and the other plaintiffs were employed for FSI as bus drivers. All the plaintiffs are African American except for Hoskins, who is Caucasian.

The plaintiffs reference several events that they claim constitute a racially hostile working environment (Count I), and which also provide a background to the plaintiffs' individual claims (Counts II–IV). These general facts will be enumerated first; then specific facts related to the particular plaintiffs' claims of discrimination and retaliation will be considered.

## A. Racially Incendiary Emails and Other Conduct Prior to 2007

The plaintiffs' complaints stretch back to November 8 and November 27, 2005, when Diana Chord sent two racially charged emails to FSI employees. Chord is a Caucasian bus driver employed with FSI. The first email includes what appears to be a white baby chicken ("chick") stating to black chicks, "what's up my nigga's??" The second involves a photograph of several African Americans dressed in medical scrubs and surrounding a Caucasian man lying on a stretcher and dressed in Ku Klux Klan regalia, including a cone-shaped hat; the caption reads, "I could be wrong, but judging by his hat, this guy just ain't gonna make it!!!!" Chord sent the emails from her personal email account to the personal email accounts of several other FSI bus drivers, as well as

[1] The facts are derived from the parties' statements of facts filed pursuant to Local Rule 56.1. Unless indicated, the facts are undisputed. At the summary judgment stage, the court is only to consider facts that are supported by evidence that would be admissible at trial. *Scott v. Edinburg*, 346 F.3d 752, 759–60 & n.7 (7th Cir. 2003). To the extent that facts are considered herein they are deemed to be admissible unless indicated to the contrary in the Analysis section.

to the FSI email address of Terry Kegley; Kegley was FSI's Contract Manager, and he supervised all the bus drivers and bus monitors in Danville. School officials also learned of these emails, and inquired of Kegley regarding how FSI was addressing the situation. The plaintiffs did not receive the emails from Chord, but were made aware of them by co-workers.

As a result of these emails, Chord was suspended for three days, although the plaintiffs were not aware of this suspension. Ron Howard, the senior regional vice president of FSI for the region that includes Danville, addressed FSI Danville employees after the emails were sent. The parties dispute what Howard said. Howard contends that he stated that the emails violated FSI's non-discrimination policy and that acting in this manner could result in discipline, including termination. The plaintiffs contend that Howard only briefly addressed FSI's policy against racial harassment and did not address the emails specifically. Several of the plaintiffs then contacted a lawyer who wrote to FSI on their behalf regarding the emails; FSI responded to the letter in writing, stating that it was looking into the matter.

In June of 2006, and May of 2007, another Caucasian co-worker, Kathleen Faber, sent racially incendiary emails to co-workers through her private email account, but these emails were never reported to FSI. In January of 2007, Chord and another Caucasian co-worker, Sheryl Witsman, were heard by plaintiffs speaking on CB radios in the school buses; Chord and Witsman were speaking in a manner that imitated an African-American speaker. Again, this was not reported to FSI management.

## B.    Termination of Hoskins in April of 2006

Plaintiff Hoskins was terminated in April of 2006. Hoskins was terminated because he failed an annual medical examination which state law requires for all bus drivers. The stated reasons for Hoskin's termination were obesity and consumption of a prescribed opiate. Hoskins contends that

his termination was in response to his complaints about the emails sent by Chord; Hoskins forwarded emails sent by Chord to FSI's Safety Coordinator Bertha Crist in December of 2005, asking if something could be done regarding Chord's insensitive behavior. Hoskins maintains that after this inquiry, Kegley acted less friendly toward him, and Kegley asked Hoskins if he had forwarded the Chord emails to school officials. Hoskins also argues that his medical review in April of 2006 was unusual because it was overseen by Kegley, whereas it is normally overseen by Crist. Hoskins finally claims that he was medically approved two years prior, in 2004, even though he contends that he was taking a stronger pain killer at that time, and he claims that his personal doctor submitted a letter on his behalf in April of 2006 stating that he was eligible to drive while taking the opiate, though the letter is not in the record.

## C.  Termination of Brooks on February 26, 2007

Brooks was terminated on February 26, 2007. Brooks was employed as a bus driver, and was terminated for violating an FSI policy prohibiting drivers from leaving children on a bus "unattended." The policy states that a driver who leaves a child on a bus unattended will be subject to immediate termination. A bus is unattended if the driver walks away from the bus; merely stepping off the bus is not a violation. Brooks signed an employee receipt form which reiterates that if a child is left unattended on the bus, termination will result.[2] On the date in question, Brooks left a student on her bus and briefly entered a school building. Brooks admits she violated the written

---

[2] In her deposition, Brooks disputes this policy existed, and states that Kegley verbally told her and other drivers during safety meetings that they had to check their buses at the end of the day; she suggests that she could not be terminated for failing to check her bus during other times of the day. Brooks' statements do not create a factual dispute regarding the policy; the alleged statements by Kegley do not contradict the written policy, and Kegley was never alleged to have said that the policy required that drivers check their buses for children *only* at the end of their shift.

policy, but contends that it was not equally applied, and that Caucasian drivers were not terminated for violating the same policy.

**D.      Derogatory Statement and Gesture by Witsman, Cunningham, and Chord on February 26, 2007**

On the date of Brooks' termination, the plaintiffs assert that Jones, Beasley, Bryant, Davis, Forthenberry, and Red witnessed Witsman, Chord, and Caucasian co-worker Wayne Cunningham, high fiving each other, hugging each other, and stating "One [N-word][3] down, more to go."  The plaintiffs contend that Witsman, Cunningham, and Chord also ran a finger across their throats as they made the derogatory statement.  Jones and Forthenberry claim to have reported some or all of this conduct to Kegley.  Kegley responded that he would take care of the problem, but the plaintiffs were aware of no action taken by Kegley.  The plaintiffs did not report the derogatory statement and gesture to other member of FSI management.

FSI disputes nearly all of these facts.  FSI points to inconsistencies between the plaintiffs' testimony as to whether all of the plaintiffs heard and observed Witsman, Cunningham, and Chord each making the derogatory statement and gesture, as well as testimony from Witsman, Cunningham, and Chord that they did not make such a statement or make such a gesture.   FSI further disputes that Jones told Kegley about the physical gesture and the derogatory statement.

FSI has a policy regarding the reporting of harassment.  Employees may report complaints to several different channels within FSI, including to their manager (in this case, Kegley).  If they are uncomfortable doing so, they may report complaints to human resources representatives.  If employees are dissatisfied with the actions taken by the person they first contact, they may take an

_____

[3] The court replaces the word actually used, "nigger," with "[N-word]" throughout the remainder of this opinion.

administrative appeal through a dispute resolution procedure. Employees can also raise complaints directly with Howard, who oversaw the region where the plaintiffs were employed.

## E.    Retaliation against Jones and Forthenberry

Jones and Forthenberry filed a complaint with the Illinois Department of Human Rights on June 4, 2007 in response to the aforementioned events. They now allege that they suffered retaliation from FSI as a result of filing that complaint. First, Jones and Forthenberry claim that they were denied staffing opportunities to train new drivers in the summer of 2007. Jones was told by Safety Coordinator Crist in approximately 2004 that staffing for the training of new bus drivers is based on seniority,[4] and that Jones was the most senior bus driver. Jones trained new drivers in the summer of 2006. However, in the summer of 2007, only Michael Ross trained new drivers; Ross was junior to both Jones and Forthenberry.

Second, Jones contends that she suffered retaliation in the form of written warnings she received for failing to attend work in 2008, once because of the funeral of a non-direct family member and once because of a foot surgery. Third, Jones contends that she was the victim of retaliation because she was not hired as a Safety Coordinator when Crist left that position in 2007. The position was offered instead to Ami Sprague, who had never driven a bus before. The parties

---

[4] FSI disputes this, though it puts forth no evidence to the contrary. FSI points to an affidavit of Crist, but Crist states only that "during the school year drivers are assigned to train new drivers based on several factors, including who is available at the time the training is to be conducted." This is not inconsistent with Jones' assertion that staffing is based on seniority; of course, within any seniority hiring system, the most senior staffer must also be available to do the work. Furthermore, Crist's affidavit has the caveat, "during the school year." Crist explains that she is prohibited from having drivers work any overtime, that drivers typically work 30 hours driving their normal routes during the school year, and that there are often additional activities that must be performed, such as training students on bus evacuation procedures, which brings many drivers very close to 40 hours. These factual assertions by Crist are not inconsistent with Jones' contention that there is a general seniority policy. Because Crist has not stated that seniority is not a consideration, Jones' assertion is taken as uncontradicted and true.

dispute many facts related to the qualifications, requirements, and even the job description of this position, but some facts are agreed: The Safety Coordinator is responsible for, among other things, handling school bus accidents, including handling insurance and workers compensation claims arising out of accidents; training and hiring new drivers and aides; maintaining all drivers and aides files; and assisting drivers with student discipline issues. However, Jones contends that the main responsibility is to train drivers, and correspondingly, that it is a qualification and a requirement that the Safety Coordinator be able to drive a bus. FSI does not dispute that this is one aspect of the job, nor that the person hired, Ami Sprague, had never previously driven a bus, or even possessed the necessary license. FSI nevertheless contends that being able to drive the bus was not a prerequisite, and that Sprague could (and did) learn to drive the bus after she was hired. It is also agreed that Sprague came from outside FSI and had extensive background handling workers' compensation and insurance claims. FSI contends that it hired Sprague in part to bring a fresh perspective to FSI, and to avoid accusations of favoritism that may have arisen if FSI had selected between Jones and the other drivers who applied, which included Chord.[5] Finally, all agree that other Caucasian FSI drivers who had not filed a complaint with the Illinois Department of Human Rights, including Chord, also applied for and were denied the Safety Coordinator position.

## II. ANALYSIS

Summary judgment is warranted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005). All facts,

---

[5] The "avoidance of accusations of favoritism" claim does not appear in either party's statement of facts, but comes from the Crist affidavit submitted and otherwise relied upon by FSI. *See* Crist Aff. ¶ 13.

and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

## A.    Count I: Hostile Work Environment

An employer is "liable for a co-employee's harassment only when [the employer has] been negligent either in discovering or remedying the harassment." *Parkins v. Civil Constructors of Ill.*, 163 F.3d 1027, 1035 (7th Cir. 1998) (citing *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).[6]  "[T]he employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir. 2000).  "Of course, it 'would be unrealistic to expect management to be aware of every impropriety committed by every low-level employee.'" *Parkins*, 163 F.3d at 1035 (citing *Carr v. Allison Gas Turbine Div., Gen. Motors Corp.*, 32 F.3d 1007, 1009 (7th Cir. 1994)).  It follows that "notice or knowledge of the harassment is a prerequisite for liability." *Id.* (citing *Perry*, 126 F.3d at 1014).  Constructive notice or knowledge can sometimes be inferred, based on the totality of the circumstances. *See Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1046 n.8 (7th Cir. 2000); *see also Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 849 (7th Cir. 2008) (requiring evidence that plaintiff "notified the employer about the harassment or that the harassment was so pervasive that a jury could infer his employer knew about it").

Sufficiency of the notice usually involves two inquiries, the first being who was notified and the second being the content of the notification.  A court must "determine whether the employer has designated a channel for complaints of harassment." *Parkins*, 163 F.3d at 1035 (citing *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir. 1997)).  If there is no "point person" identified to receive

---

[6] Although *Parkins* involved sexual harassment, "[h]ostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002).

such complaints, or if that point person is not "easily accessible, an employer can receive notice of harassment from a 'department head' or someone that 'the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment.'" *Id.* (quoting *Young*, 123 F.3d at 674). Regarding the content of the notice, a reasonableness standard is employed; "a plaintiff 'cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being [racially] harassed.'" *Id.* (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir. 1996)).

FSI concedes that many facts are in dispute, including whether Witsman, Cunningham, and Chord actually made the offensive statement and hand gesture on February 27, 2007, how many times the discriminatory statement and gesture were made, whether each of the plaintiffs witnessed these events, whether Jones reported to Kegley both the statement and the gesture, and how Kegley responded to Jones. FSI suggests that summary judgment is still warranted, however, because even if the factual disputes are construed in the plaintiffs' favor, FSI contends that it will prevail as a matter of law.

FSI argues that the events occurring on February 27, 2007, are insufficient to create a hostile work environment, that events occurring prior to February 27, 2007 occurred over too diffuse a time period to constitute a pervasive hostile work environment, and that certain of the prior events are now time-barred from consideration. The court need not resolve these issues since the events occurring on February 27, 2007, standing alone, are sufficient to establish a hostile work environment.

FSI points to cases such as *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535 (7th Cir. 2002), where that court concluded that certain "second-hand" harassment, including one

utterance of the N-word that was not targeted at the plaintiff, was insufficient to create a hostile work environment. *Id.* at 552. A hostile work environment claim requires "evidence that would establish that the allegedly hostile conduct was so severe or pervasive as to create an abusive working environment in violation of Title VII." *Id.* (citing *Russell v. Bd. of Trs. of the Univ. of Ill. at Chi.*, 243 F.3d 336, 342-43 (7th Cir. 2001)). Factors to be considered include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Russell*, 243 F.3d at 343).

The record in this case, with all inferences drawn in the plaintiffs' favor, establishes a far more hostile environment than existed in *Peters*. A singular use of the N-word is not the genesis of the plaintiffs' complaint. On the date in question, Brooks, an African-American, had been terminated. Witsman, Cunningham, or Chord, stated, "one N-word down, more to go," which could be understood to have been addressed not only to Brooks, ("one N-word down"), but also to the remaining African American employees ("more to go"). This was not second-hand harassment, either. Harassment is second-hand when it is "directed at someone other than the plaintiff," such as where sexually harassing comments are directed toward coworkers, but never toward the plaintiff who brought the lawsuit. *See Russell*, 243 F.3d at 343; *see also Peters*, 307 F.3d at 540 & n.2, 552. (noting that comment "was not directed at" the plaintiff). The hostile acts at issue may well have been directed at Brooks and the other plaintiffs. Although Brooks was not physically present when the incident occurred, other plaintiffs were, and the conduct took place in or near the employees' break room in a place visible to FSI employees. Finally, the vulgarity of the statement—not only involving the use of the N-word, *see Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (noting N-word is an "unambiguously racial epithet"), but also expressing joy that

one African American had been fired and the hope that more would follow—is compounded by the physical gesture. The implication of slicing one's fingers across one's throat, when made in conjunction with the N-word, can be inferred as an expression of not only violence but of racial oppression, making the conduct all the more threatening and vulgar in the context of a racial harassment case.

"The bounds of what, objectively, constitutes a hostile work environment elude precise demarcation," and require a case-by-case consideration. *See Van Jelgerhuis v. Mercury Fin. Co.* 940 F. Supp. 1344, 1358 (S.D. Ind. 1996) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 22 (1993) ("[t]his is not, and by its nature cannot be, a mathematically precise test.")). A ruling that as a matter of law the conduct complained of could not create a hostile work environment "is another way of saying that no reasonable person could think [the conduct was] serious enough to alter the plaintiff[s'] work environment." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808–09 (7th Cir. 2000). The court cannot so conclude here. A reasonable jury could find that Witsman's, Cunningham's, and Chord's actions interfered with the ability of the plaintiffs to perform their work at FSI. For purposes of this summary judgment motion, the events occurring on February 27, 2007, when accepted as alleged by the plaintiffs, are sufficient to establish a hostile work environment.

FSI next argues that even if the incident in question was reported to Kegley, and even if Kegley's response was insufficient, FSI should still prevail as a matter of law because the plaintiffs failed to seek review of Kegley's actions by his superiors. FSI argues that the plaintiffs acted unreasonably by failing to exhaust all of the available remedies provided, as specified in the employee handbook, and that FSI therefore cannot be found to have been negligent. *See Harvill v. Westward Commc'ns, LLC*, 433 F.3d 428, 439 (5th Cir. 2005) ("the employee unreasonably failed to take advantage of corrective opportunities provided by Westward").

FSI points to no Seventh Circuit caselaw suggesting that a plaintiff in a hostile workplace lawsuit faces exhaustion requirements; the Seventh Circuit requires *notice*, not exhaustion. This case involves harassment by a coworker, and for an employer to be liable for said harassment, the employer must have acted negligently. *See Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006) ("The standard for [harassment by] supervisors is strict liability and the standard for [harassment by] coworkers is negligence."). An employer cannot be negligent if the employer had no reason to believe that a problem existed, which is why "the employee must give 'the employer enough information to make a reasonable employer think that there was some probability that" harassment was occurring. *Id.* at 606; *see also Andonissamy*, 547 F.3d at 849 ("jury could infer employer knew about it"); *Parkins*, 163 F.3d at 1035 ("whether an employer had notice of harassment"); *Young v. Bayer Corp.*, 123 F.3d 672, 675 (7th Cir. 1997) (discussing purpose of putting employer on notice before assigning liability); *see also Cerros v. Steel Tech. Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (noting in context of affirmative defense to supervisory harassment that "[t]he relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment, thereby satisfying her obligation to avoid the harm, not whether she followed the letter of the reporting procedures set out in the employer's harassment policy."). Furthermore, an employer can be deemed to have constructive notice, which is incompatible with an exhaustion requirement since a finding of constructive notice means by definition that any handbook guidelines would not have been fulfilled. *See Andonissamy*, 547 F.3d at 849; *Mason*, 233 F.3d at 1046. There is no obligation to exhaust all available corrective remedies before bringing a lawsuit. Nor would a reasonable jury have to conclude that the plaintiffs acted unreasonably in failing to report this incident to FSI representatives other than Kegley. The question is whether FSI acted negligently in responding to the situation reported to them. In any event, the plaintiffs presented evidence that

they were dissatisfied by the response from Howard to Chord's racially charged emails, which, if believed, lends credence to their claim that FSI was not responsive to their concerns.

The plaintiffs provided notice to FSI. They notified their manager, Kegley, regarding the harassment by coworkers, which was one of several options available pursuant to the employee handbook. The plaintiffs' failure to raise their complaints with other FSI agents does not bar their claims.

As noted previously, many facts related to Count I are at issue, and are material to the ultimate determination of FSI's liability. FSI's motion for summary judgment on Count I is denied.

**B.      Count II: Discriminatory Termination of Brooks**

Brooks claims that she was terminated on February 26, 2007 because of her race. Brooks does not dispute that she violated an FSI policy prohibiting drivers from leaving a child unattended on the bus, and that the policy mandated immediate termination. Brooks argues that this policy is not uniformly enforced and that two Caucasian bus drivers also left children on their buses and were not terminated as a result.

Brooks is proceeding under the indirect method of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This method requires Brooks to first establish a *prima facie* case of discrimination, after which FSI must produce evidence of a legitimate, non-discriminatory reason for her termination. *See Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 614 (7th Cir. 2005). Brooks then must respond with evidence that the proffered explanation is pretext for discrimination. *Id.* To establish a *prima facie* case, Brooks must establish that (1) she was a member of a protected class; (2) she was meeting FSI's legitimate expectations; (3) she suffered an adverse employment action (such as termination); and (4) other similarly-situated employees who were not members of

the class were treated more favorably.  *Id.*  FSI contends that Brooks has not established a *prima facie* case.[7]

Brooks meets the first three requirements.  She is African-American; she was meeting expectations prior to her termination; and she was terminated.   FSI takes issue with the second requirement, arguing that Brooks was not meeting expectations because she did not comply with the unattended child policy. This argument is in error.  Brooks is complaining that the unattended child policy was inconsistently and unfairly applied as to her.  In this context, the second element of the *prima facie* test is focused on her performance immediately before the event that purportedly gave rise to her termination.  *See Woodard v. Rest Haven Christian Servs.*, No. 07 C 665, 2009 WL 703270, at *3–4 (N.D. Ill. Mar. 19, 2009).   There is no allegation that Brooks was performing inadequately prior to the incident on February 26, 2007.  Whether the policy justified her termination is a question of whether FSI had a legitimate basis to terminate or if the purported basis is pretext.

The fourth element is also likely satisfied, assuming Brooks can properly amend her evidence.  Brooks contends that two Caucasian employees also left students on their buses and were not terminated.  Brooks presents two affidavits attesting that bus driver Shirley Wells and bus monitor Jodi Harrier were away from their bus speaking to other bus drivers on February 27, 2007, and that the affiants reported this to Kegley.  The first affiant, Connie Cantwell, states that she was standing with Wells and Harrier in front of another driver's bus, and though Cantwell does not state that she saw a child alone on Wells' and Harrier's bus at that time, she states that she "found [it]

---

[7] FSI does not address the additional two stages of *McDonnell-Douglas*—legitimate reason and pretext—though in this case, where Brooks admits that she violated the policy which formed the basis of her termination but contends that others violated it as well and were not terminated, the pretext and *prima facie* stage will often collapse into one inquiry.  If Brooks can show that the policy was not uniformly enforced, then she will have offered evidence of pretext, as well.  *See Curry v. Menard, Inc.*, 270 F.3d 473, 479 (7th Cir. 2001).

disturbing" that Wells and Harrier had left a student on their bus because she had seen this occur

before. Cantwell avers she reported this incident to Kegley. The second affiant, Jimmy Coutant,

reports that he personally witnessed a child on Wells' and Harrier's bus, he saw Wells and Harrier

away from the bus, and he approached them and told them they could not leave their bus with a child

on it. Coutant also avers he reported this to Kegley.

FSI objects to these affidavits. First, FSI argues that these facts are at issue; Kegley states

in an affidavit that Wells and Harrier were merely standing beside the bus but had not walked away

(which would not constitute a violation). But at this stage, Kegley's affidavit is of no help to FSI,

for it merely creates a material factual dispute, which is a basis to deny FSI's motion for summary

judgment. FSI also objects to the consideration of the Cantwell and Coutant affidavits because each

is signed with the attestation, "under penalty of perjury the above statement is true and correct to

the best of my knowledge, information, and belief." This affirmation is problematic since Rule 56(e)

of the Federal Rules of Civil Procedure requires supporting affidavits to be "made on personal

knowledge." The caveat "to the best of my knowledge, information, and belief" does not satisfy this

standard. *See McMiller v. Bd. of Tr. of Univ. of Ill.*, 275 F. Supp. 2d 974, 981 (N.D. Ill. 2003).

Nevertheless, the affidavits speak in the first person, and it therefore appears more likely than not

that Cantwell and Coutant were offering personal knowledge.

Brooks also offers deposition testimony of Dominique Davis, wherein Davis testified that

another Caucasian driver, David Rice, was many feet away from his bus while a child was playing

in the bus. Davis states that she reported this incident to "Bertha," but the identity and

responsibilities of Bertha is unknown.[8] This testimony is insufficient as to Rice, for the question is

_____

[8] The plaintiffs have included only brief excerpts of deposition transcripts, and some of the
transcript pages are not clearly numbered nor in order. *See, e.g.*, Davis Tr. (Pl. Ex. 5) (Doc. No. 40-
6). If Davis further identified Bertha during her deposition, that section of the transcript was not

not only whether Rice had left his bus unattended, but whether FSI was aware of it and nevertheless treated Rice more favorably than Brooks. Kegley states in his affidavit that he was aware that a child on Rice's route was "missing"—meaning that, for example, a parent called in to report a missing child, who was actually on Rice's bus—but that Kegley never had a reason to believe that Rice left the bus while the child remained on it. Brooks does not counter Kegley's statement.

Brooks will be given twenty-one days to submit amended affidavits from Cantwell and Coutant attesting that the statements regarding Wells and Harrier are made upon personal knowledge. FSI's motion for summary judgment on Count II is denied. But if Brooks fails to proffer the required affidavits within twenty-one days, FSI may move for this court to reconsider its denial of FSI's motion regarding Count II. FSI must do so within seven days after the amended affidavits are due or are filed without the required attestation.

FSI's motion for summary judgment on Count II is denied.

## C.     Count III: Retaliatory Termination of Hoskins

State law requires bus drivers to pass a medical examination annually. Hoskins was terminated for failing that medical examination. According to the Illinois Administrative Code, one reason for a finding that a person is not physically qualified to operate a school bus is because the driver consumes opiates. 92 Ill. Adm. Code § 1035.20(i)(11). Hoskins admits that he consumed an opiate at the time of his testing, but nevertheless contends that his termination was based on retaliation because he had complained to Crist about the racially incendiary emails sent by Chord five months before his termination.

Retaliation claims can be proven by direct or indirect evidence. The indirect method involves an approach similar to that in discrimination cases. *Humphries v. CBOCS West, Inc.*, 474

included in the record.

F.3d 387, 403–04 (7th Cir. 2007). Hoskins must prove that (1) he engaged in protected activity (such as filing an EEOC charge or opposing an employer's allegedly discriminatory practice), (2) that he was subjected to an adverse employment action, (3) that he was performing his job in a satisfactory manner, and (4) that a similarly situated employee who did not engage in the protected activity was not similarly subjected to the adverse employment action. *See Sylvester v. SOS Children's Vill. Ill., Inc.*, 453 F.3d 900, 902 (7th Cir. 2006). Alternatively, Hoskins can show under the direct method that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there is a causal connection between the two. *Humphries*, 474 F.3d at 404.

The indirect method is not available to Hoskins. He does not point to any similarly situated employee who failed the medical exam but was retained by FSI. Hoskins argues that Chord also failed a medical exam and was not terminated, but this argument is without merit; in response to FSI's statement of material facts, Hoskins admits that Chord never actually failed her medical exam; rather, she was granted a three-month medical certificate because of high blood pressure, and was later granted a normal, one-year certificate when the blood pressure issue had been resolved. *See* Pls.' Resp. to Def.'s Stmt. of Facts 52 (Doc. No. 40). Because there is no evidence that Chord failed a medical exam and was without a medical certificate, Chord and Hoskins were not similarly situated. Having offered no other evidence, Hoskins cannot establish that anybody was similarly situated to himself, and cannot prevail under the indirect method.

Nor can Hoskins prevail under the direct method, as Hoskins cannot satisfy the causation requirement. FSI must establish that it would have would have terminated Hoskins even if FSI had no retaliatory motive. *Stone v. City of Indianapolis Public Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002). FSI has done so—it was required to prevent Hoskins from driving under state law, and it was reasonable for FSI to terminate him rather than continue retaining him even though he could not

work. Hoskins has not put forth any evidence that the results of the medical evaluation were incorrect. Hoskins' wife has stated in an affidavit that Hoskins' personal doctor wrote a letter stating he could drive with the prescribed opiate, but that letter is not in the record and its precise contents are unknown. Regardless of his personal doctor's opinion, Hoskins does not dispute (1) that the Illinois Administrative Code prohibits bus drivers from taking opiates, and (2) that Hoskins was taking an opiate.

FSI's motion for summary judgment on Count III is granted.

**D.      Count IV: Retaliatory Actions Against Jones**

Jones and Forthenberry allege that they were subjected to retaliation after they filed complaints against FSI with the Illinois Department of Human Rights. Jones' and Forthenberry's allegations involve three separate allegations of retaliation: first, that they were denied the opportunity to train new drivers in the summer of 2007 and during the subsequent school year; second, that Jones was given written warnings for non-attendance; and third, that Jones was not hired to be a new Safety Coordinator when Crist left this position in 2007.

  1.      Assignment of Duties to Train New Drivers

Jones alleges that after she filed a complaint with the Illinois Department of Human Rights in June, 2007, she were denied the opportunity to train new drivers that summer even though she had trained drivers in the past. Instead, a more junior driver, Ross, trained the new drivers. Jones contends that the FSI policy was for the most senior drivers to conduct new driver trainings, that she was the most senior, and that she was available but was never contacted by FSI.

Jones has satisfied the first two requirements of the direct method of proving retaliation, engaging in protected activity (filing a complaint with the Illinois Department of Human Rights), and suffering an adverse employment action (being denied additional hours). The third requirement,

causation, is also satisfied. The complaint was filed in June, and she was denied training positions later that summer. This is close enough in time to allow a reasonable juror to infer causation, *see Filipovic*, 176 F.3d at 399 ("Generally, a plaintiff may establish such a link through evidence that the discharge took place on the heels of protected activity.") (quoting *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994)), especially since Jones had worked as a trainer during the previous summer. FSI's motion for summary judgment on this claim is denied.

Forthenberry is also named as a plaintiff in this count, but Forthenberry has not offered any evidence to rebut FSI's arguments. Indeed, under the theory promoted by Jones and Forthenberry, the most senior driver was to train new drivers. Jones was senior to Forthenberry. There is therefore no evidence that Forthenberry suffered any adverse consequences; he was not permitted to train new bus drivers, but under his own theory of the case he would not have been given that responsibility even if he hadn't filed a complaint with the Illinois Department of Human Rights; Jones would have.

Because Forthenberry has introduced no evidence to support his claims, FSI's motion for summary judgment as to Forthenberry is granted.

2.    Attendance Warnings

Jones contends that she received written warnings from FSI for failing to attend work in 2008, once because of the funeral of a non-direct family member, and once because of a foot surgery. In addition to these written warnings, Jones was also assessed "attendance points" for these infractions, though the accumulated points were reset to zero at the end of that school year, and Jones suffered no other consequences from these alleged infractions.

The issue of whether these warnings and points were retaliatory need not be reached, for Jones has not suffered a cognizable harm; an adverse employment action must be something which "constitutes a significant change in employment status, such as hiring, firing, failing to promote,

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  By contrast, *de minimis* actions that do not materially affect one's employment are insufficient to state a claim.  *See* Hunt v. City of Markham, 219 F.3d 649, 653–54 (7th Cir. 2000).  The harm to Jones was minimal; she argues that the assessment of the points "substantially started Ms. Jones on the path of severe discipline," Pl. Resp. at 14 (Doc. No. 38), but she offers no evidence that any material discipline resulted.  The harm was *de minimis*.  FSI's motion for summary judgment on this claim is granted.

> 3.    Hiring of a Safety Coordinator

Jones argues that she was the victim of retaliation because she was not hired as a Safety Coordinator when Crist left that position in 2007.  The parties dispute many facts related to the qualifications, requirements, and even the job description of this position, but agree that the Safety Coordinator is responsible for handling school bus accidents, including handling insurance and workers compensation claims arising out of accidents; training and hiring new drivers and aides; maintaining all drivers and aides files; and assisting drivers with student discipline issues.

Jones agrees with the above requirements, but further contends that the main responsibility is to train drivers, and correspondingly, that it is a qualification and a requirement that the Safety Coordinator be able to drive a bus.  FSI agrees that training is one aspect of the job, and that the person hired, Ami Sprague, had never previously driven a bus, or even possessed the necessary license.  FSI nevertheless contends that being able to drive the bus was not a prerequisite, and that Sprague could (and did) learn to drive the bus after she was hired.  FSI also argues it brought on Sprague because of her extensive background handling workers' compensation and insurance claims, and to bring a fresh perspective to FSI, and to avoid accusations of favoritism that may have arisen if FSI had selected between Jones and the other drivers who applied, which included Chord.

As noted above, Jones may proceed under either the direct or indirect method to establish retaliation. Under the indirect method for a retaliation claim, the *prima facie* test is modified slightly: "The prima facie case for a failure to promote claim under the indirect method requires that the plaintiff show: '1) [s]he belongs to a protected class, 2) [s]he applied for and was qualified for the position sought, 3) [s]he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff.'" *Fischer v. Avanade, Inc.*, 519 F.3d 393, 402 (7th Cir. 2008) (quoting *Grayson v. City of Chi.*, 317 F.3d 745, 748 (7th Cir. 2003)) (alterations in original). The first and third requirements are met. And at least at this stage, so are the second and forth requirements. Resolving factual disputes in Jones' favor, Sprague was far more qualified at the paper-related parts of the job—completing workers' compensation forms, insurance forms, etc. Jones had no experience in this arena. In contrast, Jones was far more qualified in the part of the job related to driving a bus—namely, training new drivers and bus monitors or aids. The question of whether Jones or Sprague was more qualified, then, requires a balancing of competing qualifications, and a credibility determination of whether Jones' testimony that training bus drivers was the most important part of the job is correct. There is reason to doubt Jones' assertion—indeed, Jones provided evidence in response to FSI's motion for summary judgment on the assignment of duties to train new drivers claim that it is typically the responsibility of the *senior bus driver* to train new drivers, not the Safety Coordinator, and she also admitted that the Safety Coordinator position involves various administrative tasks in which she has no experience. Yet because Sprague was hired without any prior driving experience, or even the legal ability to drive a bus, the court cannot determine definitely at this stage that Jones was not more qualified. Jones has established a *prima facie* case.

The burden then shifts to FSI to establish a legitimate reason for its decision to hire Sprague. FSI offers several reasons, including that Sprague is more qualified, that FSI wanted to bring in somebody with a fresh perspective by hiring outside of the current FSI staff, and that FSI wanted to avoid accusations of favoritism by hiring outside of the current FSI staff. The question at this stage is whether a jury could find, based on the evidence, that these explanations are mere pretext, that is, that the reason given is dishonest and the true reason is based on a discriminatory intent. *Fischer*, 519 F.3d at 403. Evidence that the proffered reason is "mistaken, ill considered or foolish" does not establish pretext, so long as the employer honestly believed in the reason proffered. *Nawrot v. CPC Intern.*, 277 F.3d 896, 906 (7th Cir. 2002).

The first reason given—that Sprague is better qualified—is insufficient at this stage for FSI to prevail, for it will be the job of the fact-finder to determine whether or not this allegation is true. The same is true for the second and third reasons given—that FSI wanted to bring in a fresh perspective, and/or that it wanted to avoid accusations of favoritism. As Jones and the other plaintiffs have sufficiently demonstrated, there was substantial racial tension within the FSI workforce during this period. Of the FSI drivers who applied, Jones was the most experienced driver in terms of the number of years she had been employed as a driver. A reasonable jury could infer that the two proffered reasons are merely a cover for the fact that FSI had no interest in giving the Safety Coordinator position to Jones because she was African American and had complained about the racial hostilities she perceived at FSI. Claims of wanting to avoid the appearance of favoritism and of wanting to bring in a fresh perspective are not inconsistent with an accusation that FSI did not hire Jones because of her protected activity. Which version of events is correct must be determined by the fact-finder at trial.

FSI's motion for summary judgment on this claim is denied.

### III. CONCLUSION

FSI's motion is granted as to Count III and Count IV to the extent that Count IV relates to attendance warnings. FSI's motion for summary judgment is denied as to Count I and the remainder of Count IV. FSI's motion for summary judgment is denied as to Count II, subject to the possibility for a motion for reconsideration as described above.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   September 9 2009